UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------X

Mental Disability Law Clinic, Touro
College, Jacob D. Fuchsberg Law Center,
on behalf of its constituents,

                          Plaintiff,          CV-06-6320
                                              (CPS)(JO)

          - against -

Michael F. Hogan, Ph.D., in his official
capacity of Commissioner of the New York
State Office of Mental Health, on behalf
of himself and government operated
inpatient and outpatient treatment          MEMORANDUM
programs, Thomas MacGilvray, in his         OPINION AND
official capacity of Director of Suffolk    ORDER
County Division Of Community Mental
Hygiene Services, on behalf of himself
and all other community based providers
of out-patient treatment services, Marc
Sedler, in his official capacity as
Chairman of the Department of Psychiatry
at University Hospital of the State
University of New York at Stony Brook,
on behalf of himself and state and
local government operators of inpatient
and outpatient treatment programs, and
Paul Connor, in his official capacity as
President and Chief Executive Officer
of Eastern Long Island Hospital, on
behalf of himself and all other
non-governmental inpatient providers of
psychiatric treatment services,

                          Defendants.

----------------------------------------X
SIFTON, Senior Judge.

     Plaintiff the Mental Disability Law Clinic at Touro Law

Center ("Law Clinic") brings this as yet uncertified plaintiff

and defendant class actions on behalf of its constituents[1] under
the Protection and Advocacy for Mentally Ill Individuals Act. 42
U.S.C. § 10801 *et seq.* ("PAMII Act").[2] Plaintiff alleges that
New York Mental Hygiene Law ("MHL") § 9.60 ("Kendra's Law")[3]
violates the Equal Protection Clause of the Fourteenth Amendment
and the American with Disabilities Act. 42 U.S.C. § 12101 *et
seq.* Plaintiff seeks declaratory and injunctive relief against
the following defendants: Paul Hogan, in his official capacity as
Commissioner of the New York State Office of Mental Health
("OMH") on behalf of himself and government operated inpatient

---

[1] Constituents are those individuals for whom the Law Clinic is
authorized to provide legal representation. *See* footnote 2, *infra*.

[2] The Law Clinic is operated as part of the clinical program of the
Jacob D. Fuchsberg Law Center at Touro College. It is designated as a
protection and advocacy agency by the PAMII Act, 42 U.S.C. § 10801 *et seq.*,
under which it is authorized to investigate incidents of abuse and neglect of
individuals with mental illness and to provide legal representation to
institutionalized mentally ill individuals. Congress enacted PAMII in 1986
"to ensure that the rights of individuals with mental illness are protected"
and "to assist States to establish and operate a protection and advocacy
system for individuals with mental illness which will . . . protect and
advocate the rights of such individuals through activities to ensure the
enforcement of the Constitution and Federal and State statutes . . . ." 42
U.S.C. § 10801(a)(1), (b)(1), (2)(A).
    In New York State, the Commission on Quality of Care for the Mentally
Ill (the "Commission") receives funding under the PAMII Act to maintain a
statewide system of advocacy services for the mentally ill. The Commission
has contracted with six organizations that serve as regional focal points.
Plaintiff Law Clinic serves as the regional office for Nassau and Suffolk
counties.

[3] The law is named after Kendra Webdale, who, in January 1999, "died
tragically when she was pushed into the path of an oncoming subway train by a
mentally ill person who had a history of noncompliance with treatment." New
York State Senate Memorandum in Support of Kendra's Law, *reproduced in* 1999
McKinney's Session Laws, vol. 2 at 1822, 1825. In response to the issue of
noncompliance, the New York State Legislature enacted MHL § 9.60, which
established a system of court-ordered assisted outpatient treatment. *See* L.
1999, c. 408, §§ 1-2 (reproduced in 1999 McKinney's Session Laws, vol. 1, at
859). The relevant portions of MHL § 9.60 are set forth at length below.

and outpatient treatment programs; Thomas MacGilvray, in his
official capacity as Director of Suffolk County Division of
Community Mental Hygiene Services, on behalf of himself and all
other community based providers of outpatient treatment; Marc
Sedler, in his official capacity as Chairman of the Department of
Psychiatry at University Hospital of the State University of New
York at Stony Brook, on behalf of himself and state and local
government operators of inpatient and outpatient treatment
programs; and Paul Connors, in his official capacity as President
and Chief Executive Officer of Eastern Long Island Hospital
("ELIH"), on behalf of himself and all other non-governmental
inpatient providers of psychiatric treatment services
(collectively "defendants").

Now before this Court are defendants' motions to dismiss
pursuant to Rule 12(b)(1) and Rule 12(b)(6) of the Federal Rules
of Civil Procedure for lack of subject matter jurisdiction and
for failure to state a claim upon which relief may be granted and
plaintiff's motion for class certification.  For the reasons set
forth below, defendants Hogan's, Sedler's, and MacGilvray's
motions to dismiss pursuant to Rule 12(b)(1) are denied and their
Rule 12(b)(6) motions are granted in part and denied in part.
Defendant Connor's 12(b)(1) motion to dismiss is granted.
Plaintiff's motion for class certification is granted in part and
denied in part.

**Background**

Except as otherwise noted, the following facts are taken from plaintiff's First Amended Complaint and the papers submitted by the parties in connection with these motions. For the purposes of defendants' Rule 12(b)(6) motions, the facts in the Amended Complaint are presumed to be true, as required by applicable case law. *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).

A.  Kendra's Law

New York Mental Hygiene Law § 9.60, Kendra's Law as it is commonly known, was enacted, as briefly noted in footnote 3, *supra*, in 1999 to respond to the public outcry which arose following the death of Kendra Webdale, who was pushed off a subway platform by a mentally ill individual. The statute provides for court ordered "assisted" outpatient mental health treatment ("AOT") for persons who have been hospitalized twice within the past three years or who have acted violently towards themselves or others as a result of mental illness.

MHL § 9.60(a)(1) defines "assisted outpatient treatment" to mean:

> categories of outpatient services which have been ordered by the court pursuant to this section. Such treatment shall include case management services or assertive community treatment team services to provide care coordination, and may also include any of the following categories of services: medication; periodic blood tests or urinalysis to determine compliance with prescribed medications; individual or group therapy;

day or partial day programming activities; educational
and vocational training or activities; alcohol or
substance abuse treatment and counseling and periodic
tests for the presence of alcohol or illegal drugs for
persons with a history of alcohol or substance abuse;
supervision of living arrangements; and any other
services within a local or unified services plan
developed pursuant to article forty-one of this
chapter, prescribed to treat the person's mental
illness and to assist the person in living and
functioning in the community, or to attempt to prevent
a relapse or deterioration that may reasonably be
predicted to result in suicide or the need for
hospitalization.

New York Mental Hygiene Law § 9.60(c) states:

A person may be ordered to receive assisted outpatient
treatment if the court finds that such person:
(1) is eighteen years of age or older; and
(2) is suffering from a mental illness; and
(3) is unlikely to survive safely in the community
without supervision, based on a clinical determination;
and
(4) has a history of lack of compliance with treatment
for mental illness that has:
(i) prior to the filing of the petition, at least twice
within the last thirty-six months been a significant
factor in necessitating hospitalization in a hospital,
or receipt of services in a forensic or other mental
health unit of a correctional facility or a local
correctional facility, not including any current
period, or period ending within the last six months,
during which the person was or is hospitalized or
incarcerated; or
(ii) prior to the filing of the petition, resulted in
one or more acts of serious violent behavior toward
self or others or threats of, or attempts at, serious
physical harm to self or others within the last
forty-eight months, not including any current period,
or period ending within the last six months, in which
the person was or is hospitalized or incarcerated; and
(5) is, as a result of his or her mental illness,
unlikely to voluntarily participate in outpatient
treatment that would enable him or her to live safely
in the community; and
(6) in view of his or her treatment history and current
behavior, is in need of assisted outpatient treatment

> in order to prevent a relapse or deterioration which
> would be likely to result in serious harm to the person
> or others as defined in section 9.01 of this article;
> and
> (7) is likely to benefit from assisted outpatient
> treatment.

A treatment provider that wishes to provide compulsory outpatient treatment under Kendra's Law may do so only pursuant to an order of New York Supreme or County Court after the presentation of evidence. MHL § 9.60(e)-(j).

If an assisted outpatient fails or refuses to comply with treatment as ordered by the court; if efforts to solicit voluntary compliance are made without success; and if in the clinical judgment of a physician, the patient may be in need of either involuntary admission to a hospital or immediate observation, care and treatment pursuant to standards set forth in the Mental Hygiene Law,[4] then a physician may seek the patient's temporary removal to a hospital for examination to determine whether hospitalization is required. MHL § 9.60(n).

B. Class Allegations

Plaintiff purports to represent a class ("Plaintiff Class") of "all individuals who (1) suffer from mental illness, (2) would pose a substantial threat of physical harm to themselves or others in the absence of compulsory treatment in the community

---

[4] New York State provides for involuntary inpatient care for individuals who are dangerous, defined as posing a substantial threat of physical harm to oneself or others, and who are shown to not be amenable to treatment on a voluntary, outpatient basis. MHL §§ 9.27, 9.37, 9.39, 9.40, 9.43.

but would not pose a substantial threat of physical harm to
themselves or others if forced to undergo a regimen of outpatient
treatment and (3) are not eligible for services under MHL § 9.60
because they do not meet the eligibility criteria for services."
Brooks' Decl. in Supp. of Mot. for Class Cert. ("Brooks' Decl.")
¶ 6.[5]

Plaintiff seeks to divide this purported class into two
subclasses. The first, the State-Wide Subclass, is the same as
the overarching Plaintiff Class. Brooks' Decl. ¶ 7. The second,
the Suffolk County Subclass, consists of mentally ill individuals
in Suffolk County who could avoid involuntary hospitalization if
attempts were made to facilitate the provision of outpatient
treatment pursuant to Kendra's Law as an alternative to inpatient
care. *Id*. This subclass consists of individuals who are members
of the Plaintiff Class and who are subject to involuntary
hospitalization in facilities located in Suffolk County. *Id*.

Plaintiff also seeks to certify two defendant classes. The
first would be comprised of all individuals responsible for the
operation of treatment programs in New York State, by state or
municipal governments, that, under Mental Hygiene Law article 9,
provide treatment to individuals who suffer from mental illness

---

[5] This definition, with its third requirement, is different from the
class proposed in the First Amended Complaint ("FAC") ¶ 19. Other class and
subclass definitions in the Brooks' Declaration differ from those in the FAC.
I analyze plaintiff's motion using the definitions in the Brooks' Declaration,
as did the parties. Plaintiff must amend his complaint within 30 days of this
decision to make it consistent with these more recent class definitions.

on either an inpatient or outpatient basis (the "State and Local Government Class"). *Id*. ¶ 8. Plaintiff seeks to have defendants Hogan, MacGilvray and Sedler serve as the representatives of this class. FAC ¶ 27. The second defendant class would be comprised of individuals responsible for the operation of these treatment programs operated by non-governmental entities (the "Public Accommodation Class"). Brooks' Decl. ¶ 8. Plaintiff seeks to have defendant Connor serve as representative of this class. FAC ¶ 28. Lastly, plaintiff seeks to create a Suffolk County Defendant Subclass consisting of individuals in each defendant class who provide mental health treatment services in Suffolk County. Brooks' Decl. ¶ 9.

    C.   <u>Individual Factual Allegations</u>

Mary Jo C. ("Mary Jo") is an individual who suffers from a mental illness and is a constituent of the Law Clinic under the PAMII Act.

Mary Jo has suffered from mental illness for numerous years, but, until recently, had never been treated as an inpatient. Her condition, however, has deteriorated.

As a result of the deterioration of Mary Jo's condition, clinicians employed by a mobile crisis unit ("MCU") operated by Pilgrim Psychiatric Center, an OMH operated facility, visited Mary Jo and conducted psychiatric evaluations over a period of time. The MCU determined that a regime of psychotropic

medication was necessary to treat Mary Jo. Mary Jo, however, failed to recognize that medication could help improve her clinical condition and refused to take medication.

During the period that Mary Jo's condition had been deteriorating, her brother, Harry, notified the Suffolk County Division of Community Mental Health Services ("CMHS") and requested that CMHS initiate proceedings that would culminate in outpatient treatment for Mary Jo pursuant to Kendra's Law. Harry, however, informed CMHS that Mary Jo had not been hospitalized within the last 36 months. Nor had she caused any physical harm to herself or others.

Instead of taking steps to effectuate outpatient treatment pursuant to Kendra's Law, the MCU transported Mary Jo to the Emergency Room at the University Hospital of Stony Brook. Doctors at Stony Brook concluded that Mary Jo required inpatient treatment and transported her to Eastern Long Island Hospital ("ELIH"). Mary Jo was admitted as an inpatient on September 15, 2007. She was discharged on October 3, 2007.[6]

D. Plaintiff Class and State-wide Subclass Allegations

Generally, an assessment of dangerousness is a probability assessment in that it is a determination of the likelihood of an

---

[6] Although not in the Complaint, plaintiff notes that Mary Jo was hospitalized a second time between the filing of the Amended Complaint and the motion for class certification. April 23, 2008, Letter from W. Brooks to Judge Sifton ("Brooks Letter"), at 1. I discuss the issues arising from this second hospitalization hereafter in relation to defendants' arguments concerning mootness.

individual who suffers from mental illness causing harm to oneself or others. When making this assessment, a mental health professional applies a number of factors to determine whether the individual poses a substantial threat of causing harm to oneself or others.

An important factor when assessing whether a mentally ill person poses a substantial threat of causing harm is whether the individual will take medication to treat symptoms of mental illness. The likelihood of a mentally ill person taking medication frequently depends upon the existence of adequate supervision that will help ensure that the person takes medication. Case management services that are provided under Kendra's Law help ensure that a mentally ill individual continues to comply with a regimen of psychotropic medication.

E. <u>Suffolk County Subclass Allegations</u>

There has been little collaborative effort between Stony Brook, CMHS, mobile crisis units in Suffolk County and local psychiatric hospitals to develop a system in which outpatient treatment pursuant to Kendra's Law can be used as an alternative to involuntary hospitalization. There is accordingly little effort to determine if a person who is eligible for Kendra's law can receive outpatient treatment in lieu of involuntary hospitalization.

Many individuals subject to involuntary hospitalization are

not causing harm or at immediate risk of causing harm at the moment that supervised inpatient care is deemed necessary. Rather, many individuals, including Mary Jo, begin to manifest an increased number of symptoms of mental illness over a period of time and are monitored by mobile crisis units.

Rarely to do these mobile crisis units utilize Kendra's law to facilitate outpatient treatment for individuals in lieu of inpatient treatment, although the dangerousness of many individuals could be alleviated through a regimen of drug and other therapy on an outpatient basis.

## Discussion

I. <u>Standing</u>

In considering a motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure, a court must generally accept as true the factual allegations stated in the complaint, *Zinermon v. Burch*, 494 U.S. 113, 118, 110 S.Ct. 975, 108 L.Ed.2d 100 (1990), and draw all reasonable inferences in favor of the plaintiff. *Haines v. Kerner*, 404 U.S. 519, 520-21 (1972); *Hertz Corp. v. City of New York*, 1 F.3d 121, 125 (2d Cir. 1993). In addition to examining the complaint, however, a "court may resolve disputed jurisdictional fact issues by reference to evidence outside the pleadings, such as affidavits." *Antares Aircraft, L.P. v. Fed. Republic of Nigeria*, 948 F.2d 90, 96 (2d Cir. 1991), *vacated for reconsideration on other grounds*, 505

U.S. 1215 (1992), *reaff'd on remand*, 999 F.2d 33 (2d Cir. 1993).

Congress has authorized PAMII organizations, such as plaintiff Law Clinic, to bring suit on behalf of their constituents if they can meet the traditional test of associational standing.  *See, e.g., Doe v. Stincer*, 175 F.3d 879, 886 (11 Cir. 1999) (holding that, because a PAMII organization "represents the State's [individuals with mental illness] and provides the means by which they express their collective views and protect their collective interests," it "may sue on behalf of its constituents like a more traditional association may sue on behalf of its members"); *Aiken v. Nixon*, 236 F. Supp.2d 211 (N.D.N.Y. 2002).

To demonstrate associational standing, a PAMII organization must show that: (1) its constituents "would otherwise have standing to sue in their own right," (2) "the interests it seeks to protect are germane to [its] purpose,"[7] and (3) neither the claim asserted nor the relief requested requires the participation of individual [constituents] in the lawsuit."  *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977); *see also Stincer*, 175 F.3d at 885 ("The right to sue on behalf of its constituents, however, does not relieve [an]

---

[7] Defendant MacGilvray's argument that this lawsuit is not germane to plaintiff's purpose is specious.  The alleged harm is that individuals subject to evaluation for commitment involuntarily are not, at the same time, evaluated for AOT due to the constraints imposed by MHL § 9.60(c)(4). Evaluating whether an individual may benefit from AOT in lieu of hospitalization is not contrary to the interests of plaintiff's constituents.

Advocacy Center of its obligation to satisfy *Hunt's* first prong
by showing that one of its constituents otherwise had standing to
sue . . .").[8] Plaintiff points to only one constituent who it
alleges has standing to sue in her own right: Mary Jo.
Defendants argue that Mary Jo does not have standing to seek the
injunctive and declaratory relief requested in the Amended
Complaint.

Initially, plaintiff, as it did before this Court in *Monaco
v. Stone*, 2002 WL 32984617 (E.D.N.Y. Dec. 20, 2002), argues that,
as a non-traditional plaintiff, prosecution of these claims by
the Law Clinic, even if there were no constituent with standing,
would satisfy the case and controversy requirement of Article III
of the United States Constitution. I have rejected this argument
once, writing:

> Plaintiff Law Clinic rightly points out that the
> contours of the justiciability doctrine must be shaped
> with "reference to the purpose of the
> case-or-controversy requirements," *United States Parole
> Comm'n v. Geraghty*, 445 U.S. 388, 402, 100 S.Ct. 1202,
> 63 L.Ed.2d 479 (1980), but it proceeds to argue its
> position by offering a limited view of that purpose.
> More than simply a means of assuring vigorous advocacy,
> the justiciability requirements are also designed to
> circumscribe the "role assigned to the judiciary,"
> *Flast v. Cohen*, 392 U.S. 83, 95, 88 S.Ct. 1942, 20
> L.Ed.2d 947 (1968), to conserve judicial resources, *see*
> Erwin Chemerinsky, Federal Jurisdiction § 2.1 (3d ed.
> 1999), and to promote fairness by limiting courts'
> ability to adjudicate the rights of those who are not

---

[8] The first two elements are jurisdictional, while the third is a
prudential consideration. *See United Food & Commercial Workers Union Local
751 v. Brown Group, Inc.*, 517 U.S. 544, 555 (1996).

parties to an action, *id*. None of these objectives is
served by carving out a special exception for plaintiff
Law Clinic.

Nor does plaintiff Law Clinic's statutory mandate
affect the outcome. While Congress may abrogate
prudential limits on standing, the requirements of
Article III remain. *See Warth v. Seldin*, 422 U.S. 490,
501, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975); *Sierra Club
v. SCM Corp.*, 747 F.2d 99, 103 (2d Cir. 1984).
Plaintiff Law Clinic cites two cases, *Trautz v.
Weisman*, 846 F. Supp. 1160, 1162-63 (S.D.N.Y. 1994),
and *Rubenstein v. Benedictine Hospital*, 790 F. Supp.
396, 409 (N.D.N.Y. 1992), which, it contends, are
evidence of "a *subsilentio* recognition of the assurance
of vigorous advocacy under the PAIMI Act that has led
some courts to find PAIMI standing based solely on the
PAIMI Act without any additional requirements." (Pls.'
Mem. L. Opp. Mots. Dismiss & Mot. Summ. J. at 25.)
Neither of these cases addressed the issue of
associational standing under Article III, however, and
one of them explicitly stated that it did not reach the
issue. *See Rubenstein*, 790 F. Supp. at 409 n. 10.

*Monaco*, 2002 WL 32984617, at *22. Plaintiff contends that my

rejection of this argument six years ago may have been due to the

Law Clinic's failure to adequately brief the issue. My opinion,

however, considered more than the plaintiff's then limited view

the justiciability doctrine.

Further, plaintiff's current reliance on *Gerstein v. Pugh*,

420 U.S. 103 (1975), is misplaced. The footnote to which

plaintiff cites, footnote 11, stands for the proposition that the

termination of a class representative's claim does not moot the

claims of the unnamed members of the class.[9] *Pugh*, 420 U.S. at

111, n.11. It does not support a conclusion that an association

---

[9] Mootness is discussed in further detail below.

can demonstrate standing without identifying a constituent with standing to sue in her own right. Accordingly, I conclude, as I did in *Monaco*, that plaintiff must demonstrate a constituent with standing to sue in her own right.

A. Mary Jo's Standing as to Defendants Hogan, Sedler, and MacGilvray

In order to establish that Mary Jo otherwise has standing to sue, the Clinic must establish, "(1) an injury in fact, (2) a causal relationship between the injury and the challenged conduct, and (3) a likelihood that the injury will be redressed by a favorable decision." *United Food & Commercial Workers Union Local 751 v. Brown Group, Inc.*, 517 U.S. 544, 551 (1996); *accord St. Pierre v. Dyer*, 208 F.3d 394, 401 (2d Cir. 2000). "The party invoking federal jurisdiction bears the burden of establishing the elements of standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). Because "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n. 6, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), each plaintiff must establish the necessary elements with respect to each claim it asserts on its own behalf or on behalf of others.

Moreover, to have standing to seek the prospective injunctive and declaratory relief requested in the Amended Complaint, plaintiff must show that Mary Jo "'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or

threat of injury must be both 'real and immediate,' not

'conjectural' or 'hypothetical.'" *City of Los Angeles v. Lyons*,

461 U.S. 95, 102 (1983).  In *Lyons*, the Supreme Court found that

Lyons, who had been placed in a chokehold by a Los Angeles police

officer following a minor traffic stop, did not have standing to

seek prospective injunctive or declaratory relief.  The Court

concluded that to have standing to seek injunctive and

declaratory relief:

> Lyons would have had not only to allege that he would
> have another encounter with the police but also to make
> the incredible assertion either, (1) that all police
> officers in Los Angeles always choke any citizen with
> whom they happen to have an encounter, whether for the
> purpose of arrest, issuing a citation or for
> questioning or, (2) that the City ordered or authorized
> police officers to act in such manner.

*Id*. at 105-06; *see also O'Shea v. Littleton*, 414 U.S. 488,

495-96, (1974) (holding that "[p]ast exposure to illegal conduct

does not in itself show a present case or controversy regarding

injunctive relief . . . if unaccompanied by any continuing,

present adverse effects"); *Shain v. Ellison*, 356 F.3d 211, 215

(2d Cir. 2004) (plaintiff, who did not allege or establish the

likelihood of a future encounter with the Nassau County police

likely to result in a subsequent unconstitutional strip search,

did not have standing to seek injunction).  As the Second Circuit

summarized, "a plaintiff seeking injunctive relief must

demonstrate both a likelihood of future harm and the existence of

an official policy or its equivalent."  *Shain*, 356 F.2d at 216.

Defendants argue that Mary Jo's claim is hypothetical and based on a misreading of Kendra's Law. It is undisputed, however, that at the time of Mary Jo's first hospitalization she was ineligible to be considered for AOT under Kendra's Law and that New York has not authorized mental health providers to seek AOT for individuals who, like Mary Jo, do not meet the criteria of MHL § 9.60(c)(4). Thus, she has shown the existence of an official policy or its equivalent.

Due to Mary Jo's failure to meet the criteria of MHL § 9.60(c)(4), Mary Jo is likely to be hospitalized involuntarily again, an event that could be avoided if she were offered AOT.[10] Plaintiff has alleged that Mary Jo has a persistent mental illness, which has already required her hospitalization once as of the time the amended complaint was filed, indicating that she posed a risk of harm to herself or others. *See* MHL § 9.27. When any individual in Suffolk County is deemed to require an evaluation for inpatient care, the individual is brought to the

---

[10] Defendants argue that I must also infer that Mary Jo, who has otherwise failed to take her medication, would take the necessary medication pursuant to the court order authorizing the AOT, and that this renders Mary Jo's claims hypothetical. Taking all inferences in favor of plaintiff, however, I conclude that Mary Jo would be more likely to follow a treatment regimen if ordered by a court. Indeed, the New York Court of Appeals has recognized that "Studies undertaken in other jurisdictions with AOT laws have found that outpatients subject to court orders had fewer psychiatric admissions, spent fewer days in the hospital and had fewer incidents of violence than outpatients without court orders." *In re K.L.*, 1 N.Y.3d at 366 (citation omitted). For this reason, it may rationally be inferred that Mary Jo would be less likely to require hospitalization if subject to AOT.
For this same reason, it is irrelevant that community based services are available to Mary Jo on a voluntary basis.

psychiatric emergency room at Stony Brook.  FAC ¶ 7.  Plaintiff
also alleges that the MCU determined that a regimen of
psychotropic medication was necessary to treat Mary Jo's clinical
condition.  FAC ¶ 37.[11]  The amended complaint further alleges a
series of negative consequences flowing from her initial
hospitalization, including treatment charges, *see* FAC ¶ 55-56,
from which it can be inferred Mary Jo would prefer to remain in
the community under a court order.  The amended complaint further
alleges that if Kendra's Law did not contain the eligibility
requirements of MHL § 9.60(c)(4), individuals subject to
hospitalization could avoid inpatient care by complying with a
regimen of AOT.  *See* FAC ¶¶ 67-69.  Due to Mary Jo's illness and
the allegation that she continues to refuse to take her
medication, the likely harm of another hospitalization[12] and the
fact that this harm could be avoided if she were subject to AOT
is not too speculative or conjectural to preclude standing.[13]

_____

[11]  Although only case management services are required under AOT, it
can permissibly be inferred that where the MCU has determined that medication
would be beneficial it would be sought and included in the AOT order.  MHL §
9.60(a)(1).

[12]  Defendants argue that there is no harm if plaintiff is hospitalized
involuntarily under Article 9 of the MHL, because the Second Circuit has found
the statutory scheme satisfies due process requirements.  *Project Release v.
Prevost*, 722 F.2d 960, 971-74 (2d Cir. 1983).  This argument is circular,
however, as the harm plaintiff alleges is hospitalization that could otherwise
be avoided.

[13]  Plaintiff also argues that Mary Jo's claims were "capable of
repetition yet evading review."  Pl.'s Opp. at 10 (citing *United States Parole
Comm'n v. Geraghty*, 445 U.S. 388, 399 (1980)).  This is an argument why
plaintiff's claims are not moot, not one as to whether plaintiff has standing
to seek prospective injunctive relief.  I thus address this argument *infra*.

*See Lynch v. Baxley*, 744 F.2d 1452, 1456 (11th Cir. 1984)
(plaintiff had standing to represent a class challenging the
constitutionality of an Alabama statute that allowed for the
detention of persons awaiting civil commitment hearings in jail,
because plaintiff had a persistent mental illness and was likely
to again be the subject of involuntarily hospitalization, as
evidenced by the fact that the plaintiff had two prior
hospitalizations in the past 36 months).

Defendant MacGilvray argues that Mary Jo's injury is not
traceable to Suffolk County's conduct.  Kendra's Law makes clear,
however, that the "director of community services . . . shall
operate, direct and supervise an assisted outpatient treatment
program."  MHL § 9.60(b).  Mary Jo is undeniably excluded from
this program, based on the allegations in the Amended Complaint.

Defendants Sedler and Hogan argue that Mary Jo's injuries
are not redressable because MHL § 9.60(q) provides "[n]othing in
this section shall be construed to affect the ability of the
director of a hospital to receive, admit, or retain patients who
otherwise meet the provisions of this article regarding receipt,
retention or admission."  As noted above, however, the harm of
the failure to be considered for AOT based on the constraints of
MHL § 9.60(c)(4), which results in hospitalization, can be
redressed by a favorable decision.

Accordingly, Mary Jo, at the time of the filing of the

amended complaint, had standing to sue defendants Hogan, Sedler, and MacGilvray for the prospective injunctive relief sought.

B.  Mary Jo's Standing as to Defendant Connor

Defendant Connor argues that plaintiff has not pleaded facts sufficient to permit an inference that any particular individual will find himself or herself in the unique situation of being involuntarily admitted to ELIH because they fail to meet the criteria for AOT.  Plaintiff alleges that Stony Brook and ELIH have a working relationship, but this vague and conclusory allegation cannot support a finding that Mary Jo, if hospitalized again, will necessarily be taken to ELIH.  Indeed, ELIH has submitted an affidavit which states that there are eight other hospitals in Suffolk County that provide psychiatric treatment. Broutman Decl. ¶ 3.  Thus, not only must I infer that Mary Jo will again be hospitalized but that she will be again hospitalized at ELIH.  This is one inference too many, given the many hospitals in Suffolk County.  *See Naiman v. New York University Hospitals Center*, 1997 WL 249970, at *5 (S.D.N.Y. May 13, 1997) (four visits to hospital not sufficient to plead that plaintiff would require services of that hospital in the future). Since Mary Jo does not have standing to assert a claim against defendant Connor, as President and CEO of ELIH, neither does plaintiff.  Accordingly, the claims against defendant Connor must be dismissed with leave to replead, within thirty days of the

date of this opinion.[14]

II.  <u>Mootness of Mary Jo's Claims</u>

Defendants Hogan, Sedler, and MacGilvray argue that Mary

Jo's claims are moot, because Mary Jo was hospitalized a second

time since the filing of the Amended Complaint.  *See* Brooks

Letter at 1.  Accordingly, defendants argue, she now satisfies

the criteria set forth in MHL § 9.60(c)(4), the only barrier

asserted by plaintiff to Mary Jo's eligibility for consideration

for AOT pursuant to Kendra's Law.  "[M]ootness represents a time

dimension of standing, requiring that the interests originally

sufficient to confer standing persist throughout the suit."  13A

C. Wright, A. Miller, & E. Cooper, Federal Practice and Procedure

§ 3533.1, at 220 (2d ed. 1984).  Plaintiff concedes that "[i]n

the absence of class certification, this second hospitalization

would render moot this lawsuit,"  Brooks Letter at 1, but argues

that, because the claims are inherently transitory, certification

may be deemed to relate back to the filing of the complaint.

"[I]n general, if the claims of the named plaintiffs become

moot prior to class certification, the entire action becomes

moot."  *Comer v. Cisneros*, 37 F.3d 775, 798 (2d Cir. 1994).

---

[14]  Plaintiff also argues that it has standing because it has sought, in a request for relief, expungement of the record from Mary Jo's hospitalization at ELIH.  FAC pp. 27-28 (Request for Relief i).  Although this court may have the ability under 42 U.S.C. § 1983 to expunge criminal and hospital records maintained by state entities, the court is unaware of authority permitting it to order expungement of records maintained at a private entity and plaintiff cites none.  Accordingly, plaintiff cannot maintain standing against ELIH on the basis of this request for relief.

However, "[w]here class claims are inherently transitory,[15] 'the
termination of class representative's claim does not moot the
claims of the unnamed members of the class.'" *Robidoux v.* Celani,
987 F.2d 931, 938-39 (2d Cir. 1993) (quoting *Gerstein v. Pugh*,
420 U.S. 103, 110, n. 11 (1975)); *see also County of Riverside v.
McLaughlin*, 500 U.S. 44, 52, 111 S.Ct. 1661, 114 L.Ed.2d 49
(1991); *Sosna*, 419 U.S. 393, 402, n. 11, 95 S.Ct. 553, 42 L.Ed.2d
532 (1975).[16] Indeed, some claims are "'so inherently transitory
that the trial court will not have even enough time to rule on a
motion for class certification before the proposed
representative's individual interest expires.'" *McLaughlin*, 500
U.S. at 52 (quoting *Geraghty*, 445 U.S. at 399); *Gerstein*, 420
U.S. at 110, n. 11 (class action challenging state practice of
holding defendants for trial without probable cause hearing,
where named class representatives were convicted prior to Supreme
Court review, was not moot because the nature of pretrial
detention is such that "it was most unlikely" that the courts
would determine the constitutional challenge prior to conviction
or release; furthermore, the case was capable of repetition). In
such cases, certification may be deemed to "relate back" to the

---

[15] Plaintiff's expert, Dr. Roy Lubit, has stated that the period in
which a mentally ill individual faces a real and immediate threat of
hospitalization is generally a few days. Lubit Aff. ¶ 4.

[16] Another exception, voluntary cessation, is not applicable, as
defendants continue to require that the criteria for Kendra's Law be met prior
to seeking an AOT order.

filing of the complaint to avoid mooting the entire controversy.
*McLaughlin*, 500 U.S. at 52; *Robidoux,* 987 F.2d at 939; *Monaco v.
Stone*, 187 F.R.D. 50, 60 (1999).

Defendants argue, however, that in *McLaughlin*, *Geraghty*,
*Gerstein*, *Robidoux*, and *Monaco*, the motion for class
certification was filed (or erroneously denied) when plaintiff
still had a live claim.  In this instance, plaintiff filed the
class certification motion after Mary Jo's claim had been mooted
by her second hospitalization.  Defendants thus contend that even
if plaintiff's claims are inherently transitory, the relation
back doctrine is not applicable.  *See White v. Mathews*, 559 F.2d
852, 857 (2d Cir. 1977) (existence of a controversy at time of
filing of class certification motion was sufficient to enable
suit to proceed as a class action, although named plaintiff's
claim had been mooted following filing of motion); *Jones v.
Califano,* 576 F.2d 12, 22 (2d Cir. 1978) (case not mooted because
motion for class certification made before the administrative
relief sought was granted); *Lusardi v. Xerox Corp*., 975 F.2d 964,
977 n. 19 (3d Cir. 1992) ("no opinion of which we are aware
allows a district court to exercise jurisdiction over a class
certification motion filed by a named plaintiff lacking a live
claim at the time the motion is filed"); *Jobie O. v. Spitzer*,
2007 WL 4302921 (S.D.N.Y. Dec. 5, 2007) (denying class
certification where motion was filed over a year after named

plaintiff's claim became moot); *Jane B. v. New York City Dep't Soc. Servs.,* 117 F.R.D. 64, 69 (S.D.N.Y. 1987) ("*Sosna* exception, as developed in *Gerstein* and *Geraghty*, extends to cases in which the motion for class certification was filed before the action became moot as to the named plaintiff") (citations omitted); *Goetz v. Crosson*, 728 F. Supp. 995, 1000 (S.D.N.Y. 1990) ("In instances where a named plaintiff's claim has become moot after a motion for class certification has been filed, the relation-back doctrine provides an exception to the mootness rule").

The Second Circuit, however, has decided two relevant cases subsequent to the majority of the above cases, including *Lusardi*, which, coming from the Third Circuit, is only persuasive in any event.  In *Comer v. Cisneros*, 37 F.3d 775 (2d Cir. 1994), and *Robidoux v. Celani*, 987 F.2d 931 (2d Cir. 1993), the Second Circuit reaffirmed the proposition that in class actions the relation back doctrine refers to the filing of the complaint not the time of filing of the certification motion.  *Comer*, 37 F.3d at 798-99; *Robidoux*, 987 F.2d at 938-39.  In *Comer*, admittedly, the motion for class certification had been filed prior to the claims becoming moot, but in *Robidoux* it is unclear at what point mootness arose.  Moreover, neither case explicitly premised its holding that the relation-back doctrine was applicable on the fact that the motion for class certification had been filed prior to the claims becoming moot.  *See also Monaco*, 187 F.R.D. at 60.

Several cases have accordingly concluded that there is no
requirement in the Second Circuit that a representative's claim
must be live at the time that the motion to certify is filed.
*See German by German v. Federal Home Loan Mortg. Corp.*, 896 F.
Supp. 1385, 1399 (S.D.N.Y. 1995); *Eckert v. Equitable Life
Assurance Society of United States*, 227 F.R.D. 60, 63-64
(E.D.N.Y. 2005) ("in situations where a plaintiff has not yet had
a reasonable opportunity to file a motion for class
certification, namely, where there has been no 'undue delay,' the
court retains subject matter jurisdiction despite the plaintiff's
failure to move for class certification") (citing cases).[17]

Plaintiff did not unduly delay its motion for class
certification.  First, there is no requirement that a motion for
class certification be filed with the class complaint.  Second,
plaintiff was apparently attempting to obtain discovery from
defendants on the issue of numerosity, which defendants refused
to provide voluntarily.[18]

I also note that, although the dates of Mary Jo's second
hospitalization are not specified, there are surely individuals

---

[17]  Although *Eckert* was concerned with defendants attempting to "pick
off" named representatives by making a Rule 68 offer, its analysis is
instructive.

[18]  On April 30, 2007, the Magistrate Judge denied plaintiff's request
to schedule discovery.  Plaintiff appealed.  As I dismissed plaintiff's
original Complaint, this appeal became moot.  Upon filing of the Amended
Complaint, plaintiff did not move for additional discovery, in the belief that
his appeal was still pending.  In any event, as I address defendants' motions
to dismiss below, a scheduling order providing for discovery will soon issue.

in the class plaintiff seeks to certify who remain ineligible for
AOT.  Thus, there is little difference in plaintiff's ability to
and interest in litigating these claims at the time just prior to
Mary Jo's second hospitalization, when it had identified a
constituent with standing, and the time plaintiff filed its
motion for class certification.  Accordingly, there seems little
reason to limit the relation back doctrine to the circumstances
defendants set forth.  *See Gerstein*, 420 U.S. at 111, n.11
(existence of a class of persons suffering the deprivation is
certain and it can be assumed that attorney representing the
named respondents, a public defender, has other clients with a
continuing live interest in the case); *Oregon Advocacy Center v.
Mink*, 322 F.3d 1101, 1117-18 (9th Cir. 2003) (although not a
class action, relying on *Gerstein* to conclude that advocacy
agency had standing where constituents were certain to suffer
injury, but length of injury was short enough that any
individual's claims would likely become moot).[19]

For these reasons, I conclude that class certification,
discussed below, will relate back to the filing of the Amended
Complaint and that the lawsuit has not become moot.

---

[19] Although *Jobie O. v. Spitzer*, 2007 WL 4302921 (S.D.N.Y. Dec. 5,
2007), reached the conclusion that the purported class action was moot because
the motion for class certification was not filed prior to the mooting of named
plaintiff's claims, the case was not brought by an advocacy agency such as the
Law Clinic.

III.  <u>12(b)(6) Motion To Dismiss For Failure to State a Claim</u>

In considering a motion pursuant to Rule 12(b)(6), a court should construe the complaint liberally, "drawing all reasonable inferences in the plaintiff's favor," *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (citing *Gregory v. Daly*, 243 F.3d 687, 691 (2d Cir. 2001)), although "mere conclusions of law or unwarranted deductions" need not be accepted. *First Nationwide Bank v. Helt Funding Corp.*, 27 F.3d 763, 771 (2d Cir. 1994). Indeed, conclusory allegations "will not suffice to prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002). On a motion to dismiss, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995).

Nevertheless, to survive a 12(b)(6) motion to dismiss, the allegations in the complaint must meet the standard of "plausibility." *See Bell Atl. Corp. v. Twombly*, 127 S.Ct. 1955, 1970 (2007). Although the complaint need not provide "detailed factual allegations," *id*. at 1964; *see also ATSI Commc'ns v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 n.2 (2d Cir. 2007)(applying the standard of plausibility outside *Twombly*'s anti-trust context), it must "amplify a claim with some factual allegations . . . to render the claim plausible." *Iqbal v. Hasty*, 490 F.3d

143, 157-158 (2d Cir. 2007) (emphasis in original) (holding that the plaintiff's complaint adequately alleged the personal involvement of the Attorney General because it was plausible that officials of the Department of Justice would be aware of policies concerning individuals arrested after 9/11). The test is no longer whether there is "no set of facts" that plaintiff could prove "which would entitle him to relief." *Bell Atlantic*, 127 S.Ct. at 1969 (quoting *Conley v. Gibson*, 355 U.S. 45-46 (1957)) ("[t]he phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard"). Rather, the complaint must provide "the grounds upon which [the plaintiff's] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns*, 493 F.3d at 98 (quoting *Bell Atlantic*, 127 S.Ct. at 1965).

   *A. Equal Protection*

   The Equal Protection Clause of the Fourteenth Amendment is, of course, a directive that "all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985). Plaintiff asserts that Kendra's Law violates the clause's directive "[b]y authorizing the provision of outpatient treatment services to only [sic] those mentally ill individuals who have been hospitalized twice in the last thirty-six months or committed one or more acts of serious violent behavior or attempts at serious physical harm

within the last three [sic] years . . ." FAC ¶ 82. The relevant comparison is the group of mentally ill individuals who meet the criteria in MHL § 9.60(c)(4) and the group of mentally ill individuals who do not.

Plaintiff argues that strict scrutiny should be used in evaluating the statute because, by limiting those eligible, it "results in an unnecessary loss of physical liberty for many individuals" and liberty is a fundamental right.[20] *See Foucha v. Louisiana*, 504 U.S. 71, 86 (1992). Kendra's Law, however, does not compel confinement of individuals who do not meet its criteria. Rather, it provides one method for those who meet its criteria to avoid hospitalization. Those who do not meet its criteria may only be hospitalized if they meet the criteria set forth in other sections of the MHL. All of these sections, either by a plain reading or court interpretation, require a finding of dangerousness or threat of harm. *See* MHL §§ 9.27, 9.39, 9.40; *see also Project Release v. Prevost*, 722 F.2d 960 (2d Cir. 1983). Thus, Kendra's law does not impinge upon an individual's fundamental right to liberty because it does not speak to whether individuals who fail to meet its criteria will

---

[20] Because mentally ill individuals are not a suspect class, plaintiff does not argue that strict scrutiny should apply on that ground. *See Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 366 (2001) (quoting *Cleburne*, 473 U.S. at 445-46); *Goonewardena v. State of New York*, 475 F. Supp.2d 310, 326 (S.D.N.Y. 2007).

otherwise be committed.[21]  As such, it is subject to rational
basis scrutiny.[22]

Under rational basis scrutiny the "state legislation or
other official action that is challenged as denying equal
protection . . . is presumed to be valid and will be sustained if
the classification drawn . . . is rationally related to a
legitimate state interest." *City of Cleburne*, 473 U.S. at 440;
*see also Quill v. Vacco*, 80 F.3d 716, 725 (2d Cir. 1996), *rev'd
on other grounds*, 521 U.S. 793 (1997).  Courts have afforded
"wide discretion . . . to the states in establishing acceptable
classifications." *Quill*, 80 F.3d at 725.  In particular, states
"must have substantial latitude to establish classifications that
roughly approximate the nature of the problem perceived, that
accommodate competing concerns both public and private, and that
account for limitations on the practical ability of the State to
remedy every ill." *Id.* (quoting *Plyler v. Doe*, 457 U.S. 202, 216
(1982)).  Rational basis review "does not pass judgment upon the
wisdom, fairness, or logic of legislative decisions and mandates
upholding statutes if there is any reasonably conceivable state

---

[21]  Under MHL § 9.60(n), an individual subject who fails to comply with
an assisted outpatient treatment order issued pursuant to Kendra's law may be
removed to a psychiatric hospital for up to 72 hours for a determination of
whether civil commitment is warranted.  Although this section of the statute
clearly does impact an individual's liberty, it is not on this basis that
plaintiff argues its Equal Protection claim in this case.

[22]  For these reasons, *even Bernstein v. Pataki*, 233 Fed. Appx. 21 (2d
Cir. 1999) and *Francis S. v. Stone*, 221 F.3d 100 (2d Cir. 2000), which applied
intermediate scrutiny to insanity acquitees' challenges of commitment
procedures, are inapposite.

of facts that could provide a rational basis for the classification." *Dittmer v. County of Suffolk*, 188 F. Supp.2d 286, 292 (E.D.N.Y. 2002) (citing *General Media Comm., Inc. v. Cohen*, 131 F.3d 273, 285 (2d Cir. 1997)). Finally, rational basis review presumes a statute's validity and imposes on the party attacking the statute the burden of negating "'every conceivable basis which might support it.'" *Tarbe v. Berkel, Inc.*, 196 F.3d 136, 137 (2d Cir. 1999) (quoting *FCC v. Beach Communications, Inc.*, 508 U.S. 307, 315 (1993) (internal quotations and citations omitted); *see also Board of Trustees of University of Alabama v. Garrett*, 531 U.S. 356, 367 (2001).

In passing Kendra's Law, the legislature noted that "there are mentally ill persons who can function well and safely in the community with supervision and treatment, but who without such assistance, will relapse and require long periods of hospitalization." L. 1999, c. 408, §§ 1-2 (*reproduced in* 1999 McKinney's Session Laws, vol. 1 at 859). It further noted "[S]ome mentally ill persons, because of their illness, have great difficulty taking responsibility for their own care, and often reject the outpatient treatment offered to them on a voluntary basis. Family members and caregivers often must stand by helplessly and watch their loved ones and patients decompensate." *Id.* It concluded that the measures set forth in Kendra's Law "will permit increased monitoring and care

coordination of those persons with mental illness who are most at risk for relapse and violence." New York State Senate Memorandum in Support of Kendra's Law, *reproduced in* 1999 McKinney's Session Laws, vol. 2 at 1826.

Moreover, the New York Court of Appeals has noted that Kendra's Law was adopted in an effort to "'restore patients' dignity, and . . . enable mentally ill persons to lead more productive and satisfying lives,' while at the same time reducing the risk of violence posed by mentally ill patients who refuse to comply with necessary treatment. *In re K.L.*, 1 N.Y.3d 362, 368 (2004) (citing L 1999, Ch. 408, §2). The legislature presumably thought these criteria would effectively distinguish between severely mentally ill persons and those persons who suffer from more minor conditions of mental illness and who might otherwise be subject to court ordered assisted outpatient treatment if the totality of their illness histories were subject to review. *See In the Matter of Manhattan Psych. Ctr.*, 285 A.D.2d 189, 197 (1st Dep't 2001) (noting Legislature's intent to place as few restrictions as possible on the liberty of persons who suffer from mental illness).

Although the law undoubtedly overlooks some who may benefit from intervention through AOT, such as Mary Jo, there is no indication of irrationality in the legislature's actions, which appear to be an attempt to balance the state's interest in

addressing services to those most at risk for relapse or violence
with the civil liberties of other individuals with mental
illness.[23]

*B. ADA Claims*

In enacting the ADA, Congress found that "historically,
society has tended to isolate and segregate individuals with
disabilities, and, despite some improvements, such forms of
discrimination against individuals with disabilities continue to
be a serious and pervasive social problem."  42 U.S.C. §
12101(a)(2).  Accordingly, under Title II of ADA, which applies
to public services, "no qualified individual with a disability
shall, by reason of such disability, be excluded from
participation in or be denied the benefits of the services,
programs, or activities of a public entity, or be subjected to
discrimination by any such entity." 42 U.S.C. § 12132.

In order to make out a claim under Title II of the ADA,
plaintiff must show that (1) he is a "qualified individual"[24]

_____

[23] Plaintiff contends it "should be given the opportunity to establish
that as a whole, the group of mentally ill individuals not hospitalized twice
within a thirty-six month period pose no less of a risk of violence than those
who have been so hospitalized."  Pl.'s Opp. at 27.  Even if plaintiff could
make this showing, it would not negate every conceivable basis to support the
criteria in MHL § 9.60(c).  Nor does it address the second prong in MHL §
9.60(c)(4).

[24] The term "qualified individual with a disability" means "an
individual with a disability who, with or without reasonable modifications to
rules, policies, or practices, the removal of architectural, communication, or
transportation barriers, or the provision of auxiliary aids and services,
meets the essential eligibility requirements for the receipt of services or
the participation in programs or activities provided by a public entity."  28
U.S.C. § 12131(2).
     Although defendants argue that plaintiff is not a qualified individual

with a disability; (2) that the defendants are subject to the
ADA; and (3) that plaintiff was denied the opportunity to
participate in or benefit from defendants' services, programs, or
activities, or were otherwise discriminated against by
defendants, by reason of plaintiff's disabilities. *Henrietta D.
v. Bloomberg*, 331 F.3d 261, 276 (2d Cir. 2003).

Plaintiff brings its ADA claims alleging violations of the
ADA's so-called "integration mandate." Pursuant to Congress'
instructions, the Attorney General issued regulations
implementing provisions of Title II, including the "integration
mandate," which reads: "A public entity shall administer
services, programs, and activities in the most integrated setting
appropriate to the needs of qualified individuals with
disabilities." 28 C.F.R. § 35.130(d). "A failure to provide
placement in a setting that enables disabled individuals to
interact with non-disabled persons to the fullest extent possible
violates that ADA's integration mandate." *Joseph S. v. Hogan*, --
- F. Supp.2d ---, 2008 WL 2403698, at *5 (E.D.N.Y. May 23, 2008)
(citations and internal quotation marks omitted). "Plaintiffs

---

because Mary Jo does not meet the criteria under MHL § 9.60(c)(4), the Second
Circuit has recognized that "[i]n the context of federal or public programs
directed specifically at the disabled . . . it is difficult to apply the
traditional analysis for determining whether an applicant meets the 'otherwise
qualified' prong of his prima facie case." *Doe v. Pfrommer*, 148 F.3d 73, 83
(2d Cir. 1998). This case illustrates this difficulty and accordingly the
allegation that Mary Jo would be capable of living safely in the community if
subject to AOT satisfies this prong. Additionally, the Supreme Court in
*Olmstead v. Zimring*, 527 U.S. 581 598, n. 10 (1999), concluded that Title II
of the ADA addresses disparate treatment of members of the same protected
class.

may establish a prima facie violation of 28 C.F.R. § 35.130(d) by proving that [defendants] place certain residents [in a more restrictive setting than required], even though [those] exercising professional judgment have determined previously that the most integrated setting for those residents is a community placement." *Id.* at *6 (quoting *Messier v. Southbury Training Sch.*, 1999 WL 20910, at *9 (D.Conn. Jan. 5, 1999) (alterations in original)).

In *Olmstead v. Zimring*, 527 U.S. 581, 587 (1999), the Supreme Court, addressing the scope of the integration mandate, "confront[ed] the question whether the proscription of discrimination [in Title II of the ADA] may require placement of persons with mental disabilities in community settings rather than in institutions." *Id.* at 603. The Court concluded that the answer was "a qualified yes." *Id.* The Court held that "[u]njustified isolation . . . is properly regarded as discrimination based on disability." *Id.* at 597; *see also* 42 U.S.C. § 12101(a)(5). Thus, "unnecessary segregation of individuals with mental illness is discrimination *per se* and a violation of the ADA; no demonstration of differential treatment between individuals with mental illness and those without is required." *Joseph S.*, 2008 WL 2403698, at *6 (citing *Helen L. v. DiDario*, 46 F.3d 325, 333, 335 (3d Cir. 1995) and *Messier*, 1999 WL 20910, at *9).

The integration mandate, however, "is not boundless." *Olmstead*, 527 U.S. at 603. It is qualified by the "reasonable modifications" and "fundamental-alteration" clauses of the ADA and accompanying regulations, which provide that:

> [a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity.

28 C.F.R. 35.130(b)(7). The plurality in *Olmstead* therefore concluded that unnecessary institutionalization violates the ADA only when: 1) treatment professionals have determined that community placement is appropriate, 2) the transfer from institutional care to a less restrictive setting is not opposed by the affected individual, and 3) the placement can be reasonably accommodated, taking into account (a) the resources available to the State and (b) the needs of others with mental disabilities. *Id.* at 587; *Fisher v. Ok. Health Care Auth.*, 335 F.3d 1175, 1181 (10th Cir. 2003) ("[U]nder *Olmstead* and the applicable ADA regulations, when treatment professionals have determined that community placement is appropriate for disabled individuals [and the other *Olmstead* requirements are met], states are required to place those individuals in community settings rather than institutions"); *see also Townsend v. Quasim*, 328 F.3d 511, 517 (9th Cir. 2003)(*Olmstead* controls when the issue is the

location of services, not whether services will be provided).
Moreover, even the risk of unjustified segregation may be
sufficient under *Olmstead*. *See Fisher*, 335 F.3d at 1181-82
(concluding that even those not currently institutionalized but
only at risk of unjustified segregation may bring suit).[25]

Plaintiff claims that, by failing to authorize outpatient
services to individuals who do not satisfy the criteria for
Kendra's Law treatment under MHL § 9.60(c)(4), the statute
results in defendants Hogan, MacGilvray and Sedler unnecessarily
segregating mentally ill individuals.[26] FAC ¶ 80. Plaintiff
further claims that the integration mandate is violated because
defendants Hogan, MacGilvray, and Sedler fail collaboratively to
limit the amount of involuntary hospitalizations in Suffolk
County by developing practices that would utilize outpatient care
pursuant to Kendra's Law as an alterative to involuntary
hospitalization for people who are living independently in the
community. FAC ¶ 84.

---

[25] Since unnecessary segregation is discrimination *per se*, defendants'
citation to *Doe*, 148 F.3d at 83, for the proposition that there is no
discrimination when a disabled individual is denied services because of
something causally related to the disability that brought him to a particular
program in the first place is inapposite.

[26] As noted above, failure to consider an individual for AOT under
Kendra's Law does not necessarily mean that such individual will be
hospitalized involuntarily pursuant to another section of the MHL. While this
understanding precluded application of strict scrutiny to Kendra's Law under
plaintiff's equal protection claim, the issue under the ADA is distinct;
whether hospitalization under another section of MHL is unnecessary because
court-ordered treatment in the community, available to some under MHL § 9.60,
would serve the same purpose of rendering individuals who do not meet the
criteria of MHL § 9.60(c) non-dangerous.

Plaintiff alleges, with regards to Mary Jo, that the MCU determined that a regimen of psychotropic medication could treat Mary Jo's clinical condition.  FAC ¶ 37.  Plaintiff also alleges that Mary Jo could have lived in the community safely with the provision of treatment under Kendra's Law.  *Id*. ¶ 43.  Since medication only was required at the outset, these allegations demonstrate that a treatment professional concluded that community based treatment was appropriate.

Plaintiff further alleges a series of negative consequences flowing from Mary Jo's initial hospitalization, including treatment charges, *see* FAC ¶ 55-56, from which, taking all inferences in favor of plaintiff, it can be inferred she would prefer, and therefore consent, to remain in the community under a court order.  These allegations therefore satisfy the second *Olmstead* prong.

Although plaintiff has not alleged the placement can be reasonably accommodated, taking into account (a) the resources available to the State and (b) the needs of others with mental disabilities, it would be inappropriate to dismiss on these claims on this ground as defendants bear the burden of establishing "fundamental alteration" as a defense.  *Joseph S.*, 2008 WL 2403698, at *8 (citing cases); *see also Townsend*, 328 F.3d at 518-20.

Defendants argue that the ADA is not violated when an

individual is "den[ied] a benefit that it provides to no one."
They cite a number of cases, including *Rodriguez v. City of New
York*, 197 F.3d 611 (2d Cir. 1999), and *Doe*, 148 F.3d at 83 for
this proposition.  In *Rodriguez*, for example, the Second Circuit
held that *Olmstead* stands for the proposition that "States must
adhere to the ADA's nondiscrimination requirements with regard to
the service *they in fact provide*."  197 F.3d at 619 (quoting
*Olmstead*, 527 U.S. at 603, n. 14) (emphasis in original).  I
fail, however, to see how this argument helps defendants since
AOT is clearly provided to some individuals.[27]  Moreover, the
cited cases concern the ADA's reasonable accommodation and equal
access requirements and not the integration mandate.

Defendant MacGilvray also argues that only a court has the
power to order AOT.  This argument does not alter the conclusion
that individuals who, at the time of an evaluation for inpatient
commitment, would and could benefit from AOT but for the
requirements of MHL § 9.60(c)(4) are unnecessarily segregated if
hospitalized.

Accordingly, I conclude that plaintiff has stated a claim
under the First Cause of Action.  Although plaintiff's Third
Cause of Action could be clearer as to whether it is alleging a
violation of the integration mandate because defendants Hogan,

---

[27]  As noted above, it is irrelevant that community-based services are
available to plaintiff on a voluntary basis when the New York Court of Appeals
has recognized the benefit of court-ordered treatment for those who do not
voluntarily follow a treatment regimen.  *See In re K.L.*, 1 N.Y.3d at 366.

MacGilvray, and Sedler do not have practices in place to utilize

Kendra's Law for those who do qualify by its terms or for all

individuals subject to involuntarily hospitalization,

clarification is unnecessary.  If the latter, plaintiff has

stated a claim for the reasons above and, if the former, then

there is little question that the allegations are adequate to

state a claim under *Olmstead*.

IV.  <u>Class Certification</u>

Federal Rule of Civil Procedure 23(a) sets forth the

requirements for class certification:

> One or more members of a class may sue or be sued as
> representative parties on behalf of all only if (1) the
> class is so numerous that joinder of all members is
> impracticable, (2) there are questions of law or fact
> common to the class, (3) the claims or defenses of the
> representative parties are typical of the claims or
> defenses of the class, and (4) the representative
> parties will fairly and adequately protect the
> interests of the class.

In addition to satisfying the requirements of Rule 23(a), for a

class action to be maintainable, it must satisfy one of the

subsections of Federal Rule of Civil Procedure 23(b).  In the

present action, Rule 23(b)(2) is applicable.  Rule 23(b)(2)

requires that this Court find:

> the party opposing the class has acted or refused to
> act on grounds generally applicable to the class,
> thereby making appropriate final injunctive relief or
> corresponding declaratory relief with respect to the
> class as a whole.

The party seeking certification has the burden of demonstrating

that all of the requirements of Rule 23 are satisfied. *See
Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 613-14, 117 S.Ct.
2231, 138 L.Ed.2d 689 (1997); *Bishop v. New York City Dep't of
Hous. Preservation & Dev.*, 141 F.R.D. 229 (S.D.N.Y. 1992).
Courts must accept the complaint's allegations as true and should
avoid a preliminary inquiry into the merits of the case. *Eisen
v. Carlisle & Jacquelin*, 417 U.S. 156, 178, 94 S.Ct. 2140, 40
L.Ed.2d 732 (1974). While class certification motions may be
subject to resolution based on the pleadings, at times it is
necessary "to probe behind the pleadings before coming to rest on
the certification question." *General Tel. Co. v. Falcon*, 457
U.S. 147, 169, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982).

Class certification should be granted if the court "is
satisfied, after a rigorous analysis," that the requirements of
Rule 23 have been satisfied. *Id*. at 161; *see also In re Initial
Public Offering*, 471 F.3d 24, 41 (2d Cir. 2006) ("a district
judge may certify a class only after making determinations that
each of the Rule 23 requirements has been met"). A class may be
decertified if later events demonstrate that the reasons for
granting class certification no longer exist or never existed.

A. Plaintiff's Class

Plaintiff seeks to certify a class consisting of "all
individuals who (1) suffer from mental illness, (2) would pose a
substantial threat of physical harm to themselves or others in

the absence of court-ordered treatment in the community, but
would not pose a substantial threat of physical harm to
themselves or others if directed to undergo a regimen of
outpatient treatment and (3) are not eligible for services under
MHL 9.60 because they do not meet the eligibility criteria for
services."  Brooks' Decl. ¶ 6.

i.  Ascertainability

Although not an explicit criteria under Rule 23, courts have
held that in order for a class to be certified, the named
plaintiffs must demonstrate that there is an "identifiable
class."  *In re Methyl Tertiary Butyl Ether Products Liability
Litig.*, 209 F.R.D. 323, 336 (S.D.N.Y. 2002); 7A Charles Alan
Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and
Procedure § 1760, at 120-21 (2d ed. 1986) ("[T]he requirement
that there be a class will not be deemed satisfied unless the
description of it is sufficiently definite so that it is
administratively feasible for the court to determine whether a
particular individual is a member").  "This implied requirement
is often referred to as 'ascertainability,' and requires that a
court can determine who belongs to the class by reference to
objective criteria."  *McBean v. City of New York,* 228 F.R.D. 487
(S.D.N.Y. 2005) ("The requirement of ascertainability, though not
expressly mentioned in Rule 23, is fundamental").  Class members
need not be ascertained prior to certification, but 'the exact

membership of the class must be ascertainable at some point in the case.'" *Id*. at 337. It must be "administratively feasible for a court to determine whether a particular individual is a member" of the class and to make this determination "without having to answer numerous fact-intensive questions." *Daniels v. City of New York*, 198 F.R.D. 409, 414 (S.D.N.Y. 2001) (quotation omitted). Defendants argue that plaintiff's class is not ascertainable because numerous fact-intensive questions would have to be answered to determine whether an individual was a member of the class, including whether the individual is mentally disabled and whether an individual subject to AOT rather than hospitalization would no longer pose a threat of harm.[28]

Plaintiff, however, seeks certification under Rule 23(b)(2). "When a class action is certified under Rule 23(b)(2) . . . all persons comprising the class become mandatory members. In other words, all those who come within the description in the certification become, and must remain, members of the class because no opt-out provision exists." *Daniels,* 198 F.R.D. at 415. Moreover, plaintiff does not seek damages on behalf of the

---

[28] The relief plaintiff seeks is not based on mistaken notions that AOT is a substitute for hospitalization and that AOT mandates forced medication. Admittedly, the phrasing of the requested injunction is ambiguous and could be read to seek relief that I cannot grant, namely that AOT be implemented for all individuals who are being evaluated for inpatient treatment. The qualification that defendants provide outpatient treatment "pursuant to Kendra's Law," however, appears to make clear that plaintiff understands that the injunction would require AOT be considered for individuals subject to civil commitment evaluations and, if deemed appropriate without the constraints of MHL § 9.60(c)(4), a court order for AOT be sought in state court in lieu of hospitalization.

class and thus individual members need not be identified for the purposes of apportionment. In such circumstances, courts have certified plaintiff classes that are no more definite than the class at issue in this case. *See Daniels*, 198 F.R.D. at 412 (class of individuals illegally stopped and frisked based on race and national origin sufficiently definite because primarily injunctive relief sought); *Baby Neal v. Casey*, 43 F.3d 48, 54, 57, 65 (3d Cir. 1995) (certifying class of "all children in Philadelphia who have been abused or neglected and are known or should be known to the Philadelphia Department of Human Services"); *Koster v. Perales*, 108 F.R.D. 46, 55 (S.D.N.Y. 1985) (certifying subclass of "Needy families with children in Nassau County who are eligible for and in need of emergency shelter for whom defendants provide only shelter which is a danger to the families' health and safety").[29]

Additionally, it is not fatal to plaintiff's class that the definition makes no reference to the fact that such individuals are substantially limited in a major life activity. By definition, to be involuntarily hospitalized, one must pose a significant risk of harm to oneself or others, as noted above.

---

[29] *Cortigiano v. Oceanview Manor Home For Adults*, 227 F.R.D. 194 (E.D.N.Y. 2005) is not to the contrary. There, there was little question that the class, mentally ill individuals residing in a nursing home which set conditions for withdrawals from individuals' personal accounts held by the nursing home, was ascertainable. Although the class sought predominately injunctive relief, there was no cause to discuss whether certification would have been proper if the class had been less definite.

Interacting with others and the ability to care for oneself,
major life activities under the ADA, are thus clearly impaired.
*See Jacques v. DiMarzio, Inc.*, 386 F.3d 192, 200 (2d Cir. 2004)
(interacting with others); *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d
867, 871-72 (2d Cir. 1998) (care for oneself).  Moreover, because
only declaratory and injunctive relief is sought, individual
assessments of disability need not be made.  Accordingly, the
ascertainability criteria is satisfied.

      ii.  Numerosity

    The proposed class satisfies the numerosity requirement of
Rule 23.  Although class numerosity is presumed at 40 members,
*Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483
(2d Cir. 1995), there is no requirement that the exact number of
class members be known for class certification.  *In re Med. X-Ray
Film Antitrust Litig.*, 1997 WL 33320580, at *3 (E.D.N.Y. Dec. 26,
1997) (citing *In re Nasdaq Market-Makers Antitrust Litig.*, 169
F.R.D. 493, 509 (S.D.N.Y. 1996)).  "[C]ourts are empowered to
'make common sense assumptions to support a finding of
numerosity.'"  *Nicholson v. Williams*, 205 F.R.D. 92, 98 (E.D.N.Y.
2001) (quoting *German v. Fed. Home Loan Mort. Corp.*, 885 F. Supp.
537, 552 (S.D.N.Y. 1995)).  Although unable to present exact
numbers because defendants have opposed discovery on the issue,
plaintiff has submitted an affidavit showing that there are one
to three civil commitment hearings per week in Suffolk County

alone, and such hearings occur only if the committed individual
so requests, suggesting that there are additional, unopposed
civil commitments. Brooks Rep. Decl. ¶¶ 7-8. Moreover, in a
three year period from 1999-2002, New York courts issued 2,443
assisted outpatient treatment orders. *Id.* ¶ 10. From these
figures, I am satisfied that there are numerous civil commitment
proceedings and that among these are individuals who could
otherwise benefit from AOT if not required to meet the criteria
under MHL § 9.60(c)(4).

Moreover, a determination of impracticability depends not
only on numbers, but on the totality of the circumstances of a
case. *Monaco*, 187 F.R.D. at 61 (citing *Robidoux*, 987 F.2d at
936). Other relevant considerations include "judicial economy
arising from the avoidance of a multiplicity of actions,
geographic dispersion of class members, financial resources of
class members, the ability of claimants to institute individual
suits, and requests for prospective injunctive relief which would
involve future class members." *Robidoux,* 987 F.2d at 936 (citing
1 Herbert B. Newberg, Newberg on Class Actions § 3.06, at 143 (2d
ed. 1985)). Many of these factors are present in this case,
further counseling in favor of numerosity. Finally, the fluidity
of the class ineligible for AOT due to the criteria in MHL §
9.60(c)(4) makes class certification particularly appropriate.
*Monaco*, 187 F.R.D. at 61 (citing *Goetz v. Crosson*, 728 F. Supp.

995, 1001 (S.D.N.Y. 1990)).  Accordingly, I am satisfied that the requirements of Rule 23(a)(1) are met.

    iii.  Commonality

Commonality requires that class members' claims share a common question of law or fact.  *Robinson v. Metro-North Commuter R.R. Co.*, 267 F.3d 147, 155 (2d Cir. 2001).  Where "injuries derive from a unitary course of conduct by a single system," a district court is within its discretion in finding commonality.  *Marisol A. v. Guiliani*, 126 F.3d 372, 377 (2d Cir. 1997)).  Plaintiff alleges that this element is satisfied because, as to its remaining claims, the exclusion of individuals subject to civil commitment from consideration for AOT due to the criteria of MHL § 9.60(c)(4) violates the integration mandate of the ADA.[30]

Defendants argue that, since a determination that an individual requires AOT or involuntary inpatient care is an individual one, a finding of a common question of fact or law is precluded.  The relevant factual differences at issue here have less to with the individuals' mental condition than with its objective manifestations in terms of hospitalization or a history of violence.  Minor factual differences will not preclude class

---

[30]  Defendants Hogan and Sedler contend at length that Kendra's Law should be strictly construed because it imposes on an individual's liberty and was not intended to otherwise supplant New York's civil commitment scheme under MHL Article 9.  The first argument is irrelevant for reasons already noted and the second, if an accurate characterization of the effects of plaintiff's claims, if successful, is a defense to be raised.

certification if there is a common question of law. *Monaco*, 187
F.R.D. at 61 (citing *Jackson*, 156 F.R.D. 538, 542 (E.D.N.Y. 1994)
and *Luyando v. Bowen*, 124 F.R.D. 52, 55 (S.D.N.Y. 1989)); *see
also Daniels*, 198 F.R.D. at 417 (commonality satisfied when the
"claims of the proposed class stem from the same alleged
unconstitutional conduct of the defendants") (citations and
internal quotation marks omitted); *Dodge v. County of Orange*, 208
F.R.D. 79, 88 (S.D.N.Y. 2002) (commonality exists when injuries
"'derive from a unitary course of conduct by a single system'")
(quoting *Marisol A.*, 126 F.3d at 377). Accordingly, there is a
common question of law and this requirement is satisfied.

     iv. Typicality

    "Typicality requires that the claims of the class
representatives be typical of those of the class, and is
satisfied when each class member's claim arises from the same
course of events, and each class member makes similar legal
arguments to prove the defendant's liability." *Robinson*, 267
F.3d at 155 (internal citations and quotations omitted). The
requirement ensures that "maintenance of a class action is
economical and [that] the named plaintiff's claim and the class
claims are so interrelated that the interest of the class members
will be fairly and adequately protected in their absence." *Id*.
(quoting *General Tel. Co. v. Falcon*, 457 U.S. 147, 157 n. 13
(1982)). The typicality requirement "has been found to be

satisfied when the claims of the representatives and other class members are based on the same legal or remedial theory and there are no antagonistic interests between the two groups." *In re Med. X-Ray Film Antitrust Litig.*, at *3 (internal citations and quotations omitted). "The proper inquiry is whether other members of the class have the same or similar injury, whether the action is based on conduct not special or unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *In re NASDAQ Market-Makers Antitrust Litig.*, 169 F.R.D. at 510.

Again, although there may be factual distinctions between individuals, plaintiff argues every failure to consider one being evaluated for civil commitment for AOT that results in civil commitment violates Title II of the ADA. Accordingly, this element is also satisfied.

> v. Adequacy

The final requirement of Rule 23(a) is adequacy of representation. This requirement consists of two elements: (1) the representative plaintiffs' attorneys must be qualified, experienced, and generally able to conduct the litigation, and (2) the plaintiffs' interests must not be antagonistic to those of the remainder of the class. *In re Drexel Burnham Lambert Group, Inc.*, 960 F.2d 285, 291 (2d Cir. 1992). Plaintiff's counsel's qualifications are not in dispute.

Defendants argue that plaintiff's interests are antagonistic to those of its constituents because it seeks, as one alternative, an injunction prohibiting application of Kendra's Law, and thus AOT, to any individual. I agree that such an injunction is not in the best interests of plaintiff's constituents, as it would limit the alternatives to involuntary commitment for those who now qualify for AOT.

However, plaintiff also seeks a mandatory injunction requiring all individuals subject to civil commitment evaluations be considered for AOT. Such an injunction would certainly be in the best interest of all of plaintiff's constituents. *See In re K.L.*, 1 N.Y.3d at 366 ("Studies undertaken in other jurisdictions with AOT laws have found that outpatients subject to court orders had fewer psychiatric admissions, spent fewer days in the hospital and had fewer incidents of violence than outpatients without court orders") (citation omitted). Contrary to defendants' assertions, such an injunction would not require every mentally ill individual to be subject to a deprivation of liberty under Kendra's Law. Instead, those subject to a civil commitment evaluation might be spared hospitalization if the requirements of MHL § 9.60(c)(4) were removed. Accordingly, on condition that the complaint is amended to remove plaintiff's request for the prohibitory injunction, this prong of Rule 23(a) will be satisfied as well.

vi.  Rule 23(b)(2)

Class certification is appropriate where the defendant "has acted or refused to act on grounds generally applicable to the class," thereby making injunctive or declaratory relief appropriate.  Fed. R. Civ. P. 23(b)(2).  Defendants do not dispute this criteria, nor could they.  Indeed, when a plaintiff seeks "classwide structural relief that would clearly redound equally to the benefit of each class members," certification pursuant to 23(b)(2) is appropriate.  *Marcera v. Chinlund*, 595 F.2d 1231, 1240 (2d Cir.), *vacated and remanded on other grounds sub nom. Lumbard v. Marcera*, 443 U.S. 915 (1979).

Accordingly, plaintiff's class definition meets the criteria of Rule 23 and is certified.

B.  Plaintiff Subclasses

Plaintiff also seeks to certify two subclasses.  The first, the State-wide Subclass, is the same as the Plaintiff Class. Accordingly, although redundant, the first subclass is certified.

The second subclass, the Suffolk County Subclass,[31] consists of mentally ill individuals in Suffolk County who could avoid involuntary hospitalization if attempts were made to facilitate the provision of outpatient treatment pursuant to Kendra's Law as an alternative to inpatient care.  This subclass is really no more than the overarching Plaintiff Class confined to Suffolk

---

[31]  Defendants incorrectly argue that plaintiff has not identified a constituent within this subclass, as Mary Jo falls within its definition.

County.  Accordingly, it, too, is certified.

C.  *Galvan* Doctrine

Defendants argue that, pursuant to *Galvan v. Levine*, 490
F.2d 1255 (2d Cir. 1973), *cert. denied*, 417 U.S. 936 (1974), a
class action is not a superior method of adjudicating plaintiff's
claims because any judgment for plaintiff will, by its nature,
inure to the proposed class members without certification.
However, as I decided in *Monaco*, where the plaintiff's interest
in averting the possibility of mootness makes class certification
more than an "empty formality", class certification is a superior
method of adjudication.  187 F.R.D. at 63; *see also Brown v.
Kelly*, 244 F.R.D. 222, 236 (S.D.N.Y. 2007) (courts consider
whether certification is necessary to prevent mootness in
considering whether to apply *Galvan* doctrine).

Moreover, plaintiff seeks affirmative relief, including
mandatory, rather than prohibitory, injunctions directing
defendants to consider individuals subject to civil commitment
for AOT and to develop collaborative policies and practices aimed
at providing treatment pursuant to Kendra's Law.  When such
affirmative relief is sought, courts have declined to apply the
*Galvan* doctrine.  *Monaco*, 187 F.R.D. at 63; *Brown*, 244 F.R.D. at
236-37; *Cortigiano*, 227 F.R.D. at 208, n.4.

D.  Defendant Classes

Plaintiff also seeks to certify a class, the State and Local

Government Class, of "all individuals responsible for the
operation of treatment programs in New York State," by state or
municipal entities, "that, under Mental Hygiene Law article 9,
provide treatment to individuals who suffer from mental illness
on either an inpatient or outpatient basis."[32]  Plaintiff further
seeks to create a Suffolk County defendant subclass, consisting
of members of the State and Local Government Class in Suffolk
County.  The requirements of Rule 23 govern the certification of
defendant classes as well as plaintiff classes.  *Consolidated
Rail Corp.*, 47 F.3d at 483.

   a.  State and Local Government Class and Subclass

      i.  Ascertainability

   The Second Circuit has cautioned that "[a]n over-broad
framing of the class may be so unfair to the absent members as to
approach, if not amount to, deprivation of due process."  *Haitian
Ctrs. Council, Inc. v. McNary*, 969 F.2d 1326, 1337-38 (2d Cir.
1992).  I agree that plaintiff's definition of the State and

---

[32]  Because I have dismissed defendant Connor from this action, I cannot
certify the defendant class of private or non-profit providers of inpatient
and outpatient treatment, as there is no adequate representative.
   I note, however, that defendant Connor, in opposition to plaintiff's
motion for class certification, argued that he would not be an adequate
representative because ELIH does not have the resources to serve as a class
representative.  Connor Opp. at 11.  In response, plaintiff acknowledged he
did not wish to cause financial damage to ELIH and apparently withdrew its
request that Connor act as the class representative.  Brooks Rep. Decl. ¶¶ 15-
16.  Plaintiff, however, reserved the right to conduct discovery regarding
whether another private provider may be named as a defendant in this action
and to later either move to certify a defendant class of private providers
with the new defendant as class representative or to modify the current
defendant class description to include private providers with defendants
Hogan, Sedler, and MacGilvray as class representatives.  *Id*. at ¶ 16.  I
express no opinion on the matter.

Local Government Class borders on being over-broad and vague, but it does not reach the level of deprivation of due process and its membership is sufficiently ascertainable for the purposes of the relief sought.  Moreover, the remaining requirements of Rule 23(a) address any remaining due process issues.

### ii.  Numerosity

Although defendants contest numerosity, their arguments are without merit given the statewide definition of the class.

### iii.  Commonality and Typicality

Since plaintiff is challenging the facial validity of Kendra's law, as opposed to its application, commonality and typicality are satisfied.  Again, as with the plaintiff class, the question of whether the failure to consider individuals subject to civil commitment evaluations for AOT, due to the constraints of MHL § 9.60, violates the ADA is common to all defendants.  For this reason, it is irrelevant that the various counties may implement AOT in slightly different fashions.

Defendants are also typical.  Because all are bound to follow MHL § 9.60(c)(4), the defenses asserted by defendants Hogan, Sedler, and MacGilvray can be expected to be typical of the remainder of the proposed defendant class of those who operate treatment programs in New York state.  The need for court authorization of AOT does not eliminate typical defenses, because MHL § 9.60(c)(4) limits the class of individuals whom the providers of treatment may seek to assist through AOT.

iv.  Adequacy

The only argument that defendants Hogan and Sedler are not adequate is that they do not belong to the purported class.  This is contradicted by their responsibilities as (1) Commissioner of OMH, which oversees all inpatient and outpatient treatment in New York, and (2) Chairman of the Department of Psychiatry at Stony Brook School of Medicine, which operates a Comprehensive Psychiatry Emergency Program, a 30 bed adult inpatient unit, and outpatient treatment facilities.  Vigorous advocacy by defendants Hogan's and Sedler's counsel, the New York State Attorney General's Office, as well as MacGilvray's counsel, the Suffolk County Attorney's Office, is ensured.  *See Monaco*, 187 F.R.D. at 65.  Defendant MacGilvray argues that he is reluctant to represent municipalities, but class certification requires only adequacy, not willingness, and there is no indication that defendant would not be an adequate representative.  *See Brown v. Kelly*, 244 F.R.D. 222, 241 (2007).  As noted above, the questions of law are common and the defenses typical.

Moreover, typicality and adequacy requirements are both satisfied here under the juridical link doctrine.[33]  A juridical link is "some independent legal relationship which relates all defendants in such a way that a single resolution of the dispute

---

[33]  A juridical link also obviates the general requirement that a defendant class should not be certified unless each member of the plaintiff class has a claim against each member of the defendant class.  *Monaco*, 187 F.R.D. at 65.

is preferred to a multiplicity of similar actions." *Id*. at 240 (citations omitted); *Monaco*, 187 F.R.D. at 65 (citations omitted). A particularly strong juridical relationship exists in cases "[w]here all members of the defendant class are officials of a single state and are charged with enforcing or uniformly acting in accordance with a state statute, or common rule or practice of state-wide application, which is alleged to be unconstitutional." *Brown*, 244 F.R.D. at 240 (citation and internal quotation marks omitted). In this case, all defendants may seek authorization for AOT for some individuals but not others due to the constraints imposed by MHL § 9.60(c)(4). Although cases finding a juridical link generally do so when the named representatives have similar titles and responsibilities to other unnamed defendants, the doctrine by its terms does not require such a relationship.

### v.  Rule 23(b)(2)

"[I]t is now settled that 23(b)(2) is an appropriate vehicle for injunctive relief against a class of local public officials." *Marcera v. Chinlund*, 595 F.2d 1231, 1238 (2d Cir. 1979), *vacated on other grounds sub. nom.*, *Lombard v. Marcera*, 442 U.S. 915 (1979). Accordingly, certification of the State and Local Government Class is appropriate under Rule 23(b)(2).[34]

I therefore certify the State and Local Government Class.

---

[34]  I accordingly do not address plaintiff's argument that certification is appropriate under Rule 23(b)(1)(B).

b.  Suffolk County State and Local Government Subclass

Plaintiff asserts this subclass, consisting of individuals in the State and Local Government Class located in Suffolk County, is necessary to provide a mechanism to assert relief against only appropriate individuals on plaintiff's Third Cause of Action.  Although the Third Cause of Action is distinct from the First because it focuses on the collaborative efforts of defendants Hogan, Sedler, and MacGilvray, certification of the subclass remains appropriate.  The plaintiff class and subclasses, by definition, include only those ineligible for AOT. Thus, no defendant will have sought AOT for any such individual, precluding any issue of factual differences, and the juridical link, application of MHL § 9.60(c)(4), remains present.  The numerosity, commonality, typicality, adequacy, and Rule 23(b)(2) requirements are satisfied for the same reasons as set forth in Section 4.D.a, *supra*.

## Conclusion

For the reasons set forth above, defendant Connor's motion for dismissal of all claims under Rule 12(b)(1) is granted. Defendants Hogan's, Sedler's and MacGilvray's motions for dismissal under Rule 12(b)(1) are denied and their motions for dismissal under Rule 12(b)(6) are granted with respect to the Second Cause of Action and denied in all other respects. Plaintiff's motion for class certification is granted in part and

denied in part.  The clerk is directed to transmit a copy of the

within to all parties and to the assigned Magistrate Judge.

SO ORDERED.

Dated :   Brooklyn, New York
          August 26, 2008

                    By:  /s/ Charles P. Sifton (electronically signed)
                              United States District Judge